IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PENTWATER EQUITY OPPORTUNITIES MASTER FUND, LTD., PWCM MASTER FUND LTD., PENTWATER CAPITAL MANAGEMENT L.P., and MATTHEW HALBOWER, | ) ) ) ) ) ) ) | No. 15-cv-1885 Judge Robert M. Dow, Jr. |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C., | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER AND OPINION**

Plaintiffs Pentwater Equity Opportunities Master Fund, PWCM Master Fund Ltd. (collectively, the "Funds"), Pentwater Capital Management L.P. ("Pentwater") and Matthew Halbower ("Halbower") bring suit against Defendant Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. ("Baker") for declaratory relief, fraudulent inducement, fraudulent misrepresentation, and fraudulent concealment. Before the Court is Baker's motion [14] to dismiss Plaintiff's complaint for lack of personal jurisdiction and to dismiss the request for declaratory relief for failure to join an indispensable party. Baker's motion [14] is granted. As explained below, Plaintiffs have failed to make a prima facie showing that Baker knew that the effects of its allegedly tortious conduct would be felt in Illinois. The Court finds it unnecessary to reach the other issues raised in Baker's motion, namely: 1) whether the Court should decline jurisdiction based on the fiduciary shield doctrine; 2) whether Plaintiffs' claim for declaratory relief should be dismissed for failure to join an indispensable party; or 3) whether Plaintiffs' fraud

claims should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted.[1]

I. **Background**

For the purposes of the instant motion, the Court accepts as true the factual allegations relevant to jurisdiction made in Plaintiffs' complaint, and draws all reasonable inferences in Plaintiffs' favor. *Cent. States, Se. & Sw. Area Pension Fund v. Phencorp Reinsurance Co., Inc.*, 440 F.3d 870, 878 (7th Cir. 2006)   The Court also resolves any disputes concerning relevant facts in Plaintiffs' favor. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003).  To the extent that Baker has submitted affidavits opposing jurisdiction or contradicting Plaintiffs' allegations, however, Plaintiffs must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction. *Id.* at 783.

The Funds are pooled investment funds that invest in public and private companies. [1-1] at 3.  The Funds are organized and operate their principal place of business in the Cayman Islands, a British Overseas Territory. *Id.*  Pentwater manages the Funds and directs their investment.  Pentwater is based in Evanston, Illinois. *Id.* at 3-4.  Halbower is the Chief Executive Officer ("CEO") and Chief Investment Officer ("CIO") of Pentwater and a resident of Illinois. *Id.* at 3.

In 2012, the Funds and American Standard Energy Corporation ("ASEN") entered into a credit agreement under which the Funds loaned money to ASEN. [15-1] at 4.  ASEN is a Nevada corporation with its principal place of business in Texas and offices in Texas and Arizona. [1-1] at 4. ASEN's assets consisted primarily of oil and gas producing properties in Texas and North Dakota. [15-1] at 4.

---

[1] The Court requested that the parties defer briefing on Baker's Rule 12(b)(6) arguments.  Given its finding that it lacks personal jurisdiction over Baker, the Court need not (and would lack authority to) order further briefing on the 12(b)(6) arguments.

In early 2014, the Funds entered into another credit agreement with ASEN under which ASEN borrowed an additional $46 million from the Funds (the "Credit Agreement"). [1-1] at 4. Pentwater and its attorneys handled all of the negotiations on behalf of the Funds. See *id.* at 4-6. Halbower and Francis Strezo, a Pentwater portfolio manager located in Illinois, participated in the negotiations. See [30-1] at 3-5 (Halbower declaration); [30-2] at 2-3 (Strezo declaration). See also [15-1] at 5 (Grindon declaration). Pentwater outside counsel Anthony Herrerra, an attorney in Holland & Knight's Dallas, Texas, office, represented the Funds and Pentwater. [1-1] at 4-5.

Baker acted as lead counsel for ASEN. [1-1] at 4. Baker is a law firm organized under the laws of and with its principal place of business in Tennessee and offices in Alabama, Florida, Georgia, Louisiana, Mississippi, Tennessee, and Texas. *Id.* at 3; [15-7] at 3 (Hicks declaration). Baker has no offices, real property, or bank accounts in Illinois. *Id.* Four of Baker's 693 attorneys and advisors have active Illinois law licenses. *Id.* The lead Baker attorney on the ASEN transaction was Tonya Mitchem Grindon ("Grindon"), a partner in the firm's Nashville, Tennessee office. [1-1] at 4. Grindon is not and has never been licensed to practice in Illinois. [15-1] at 2 (Grindon declaration).

At the time of the negotiations, Pentwater and the Funds knew that ASEN was a financially distressed company. [1-1] at 4. Pentwater and the Funds also knew that ASEN allegedly owed past due fees to Baker for legal work, unrelated to the Credit Agreement, that Baker had previously performed. *Id.* at 5. Based on this knowledge, Pentwater demanded and required that as a condition of the Funds entering into the Credit Agreement, ASEN would refrain from paying Baker for past due legal fees or any future legal fees—other than $315,000 that ASEN was authorized to pay Baker upon closing the deal—until such time as ASEN had

3

disposed of sufficient assets to allow it to repay at least $20 million toward the principal balance of the loan. *Id.* Pentwater's and the Funds' rationale was that they did not want cash to leave ASEN to pay unsecured creditors like Baker when the Funds would be in the position of being secured creditors under the Credit Agreement. *Id.* Pentwater and Herrerra communicated the Condition to ASEN and Baker orally and in writing in January 2014. *Id.* See also [30-2] at 3 (Strezo declaration). "Pentwater and Mr. Herrera made it absolutely clear that unless this Condition was satisfied in a signed agreement between ASEN and Baker in a form satisfactory to Pentwater, no loan would be made by the Funds to ASEN." [1-1] at 5.

On January 30, 2014, ASEN's CEO, J. Steven Person, and Grindon executed an agreement (the "First Letter Agreement"), which provided in relevant part:

> You, acting on behalf of Baker Donelson, and with authorization to act in such capacity and to bind Baker Donelson accordingly, are offering to accept $315,000 in cash as the first payment due and payable in relation to ASEN's existing debt to Baker Donelson at the closing of ASEN's financing with Pentwater Capital, and then to defer a second payment of an additional $315,000 owed, along with the amount of any other legal fees hereinafter incurred, until such time as ASEN has liquidated assets and through such liquidation received at least $20,000,000 in proceeds *and at least $20,000,000 has been utilized to repay debt owed to Pentwater*. Please confirm our understanding of your offer with your signature below. In addition, you, acting on behalf of Baker Donelson, and with authorization to act in such capacity and to bind Banker Donelson accordingly, agree that Baker Donelseon will continue to represent ASEN without attempting to withdraw from any representation of ASEN, subject to and except as required to comply with any ethical obligations under the applicable Rules of Professional Conduct, *or demanding any further cash payments from ASEN until at least $20,000,000 has been utilized to repay debt owed to Pentwater*.

[1-1] at 29-30 (emphasis added). Grindon signed the First Letter Agreement on behalf of Baker. *Id.* at 30.

On January 31, 2014, Grindon emailed a copy of the "fully executed" First Letter Agreement to Herrera (Plaintiffs' outside counsel in Texas) and copied Strezo (Pentwater's portfolio manager in Illinois). [1-1] at 19.

4

Later the same day, Baker and ASEN replaced the First Letter Agreement with another agreement (the "Second Letter Agreement"). [1-1] at 6. The above-quoted language from the First Letter Agreement was replaced with the following language in the Second Letter Agreement:

> You, acting on behalf of Baker Donelson, and with authorization to act in such capacity and to bind Baker Donelson accordingly, are offering to accept $315,000 in cash as the first payment due and payable in relation to ASEN's existing debt to Baker Donelson, and then to defer a second payment of an additional $315,000 owed, along with the amount of any other legal fees hereinafter incurred, until such time as ASEN has liquidated assets and through such liquidation received at least $20,000,000 in proceeds. Please confirm our understanding of your offer with your signature below. In addition, you, acting on behalf of Baker Donelson, and with authorization to act in such capacity and to bind Banker Donelson accordingly, agree that Baker Donelseon will continue to represent ASEN without attempting to withdraw from any representation of ASEN, subject to and except as required to comply with any ethical obligations under the applicable Rules of Professional Conduct.

[1-1] at 239-40. Grindon and Baker did not send a copy of the Second Letter Agreement to Herrerra or Plaintiffs. [1-1] at 6. See also [30-1] at 4-5 (Halbower declaration); [30-2] at 4 (Strezo declaration); [15-1] at 7-8 (Grindon declaration).

During the closing of the Credit Agreement, Baker represented that the First Letter Agreement "was the agreement between Baker and ASEN related to any past due fees and future fees ASEN owed Baker," even though Baker knew at this time "that it has entered into and/or agreed to the Second Letter Agreement." [1-1] at 10. On February 5, 2014, Pentwater, relying on the First Letter Agreement, allowed the Funds to close on the Credit Agreement with ASEN. *Id.* at 6. (Pentwater and Baker are not parties to the Credit Agreement.) Section 9.1(s) of the Credit Agreement provides that an "Event of Default" will exist under the Credit Agreement if:

> except with respect to the payment of $315,000 to Baker, Donelson, Bearman, Caldwell & Berkowitz, PC ("Baker Donelson") to be made on the Closing Date, Borrower shall make any payment to Baker Donelson unless such payment (i) was made in connection with the successful disposition of assets of the Borrower,

5

the net proceeds of which are at least equal to $20,000,000 or (ii) is otherwise consented to in writing by the Lenders[.]

[1-1] at 90.

Between February 5, 2014 and December 2014, ASEN engaged in two asset disposals and repaid $8.9 million to the Funds. [1-1] at 6. In December 2014, ASEN and a third party signed a purchase and sale agreement ("Sale Agreement") for a third asset disposal. *Id.* at 7. The assets that were to be disposed of in the Sale Agreement were assets in which the Funds also held liens and security interests pursuant to the Credit Agreement. *Id.*

Baker represented ASEN during the negotiation, documentation, and closing of the Sale Agreement. [1-1] at 7. In order to close the transaction, ASEN needed to obtain lien releases from the Funds authorizing the assets to be sold. *Id.* Baker prepared consents and partial lien releases for the Funds to execute. *Id.* The Funds conditioned their consents and releases on approving the allocation of the proceeds from the sale. *Id.* ASEN and Baker knew that the Funds' consents were conditioned on the proceeds of the sale being distributed in accordance with the flow of funds previously approved by Pentwater and the Funds. *Id.* Plaintiffs allege on information and belief that Baker released the Funds' consents and partial lien releases to the purchaser of the assets without the Funds' permission. *Id.*

The Sale Agreement closed, but the Funds did not immediately receive the proceeds of the sale. [1-1] at 7. Plaintiffs allege on information and belief that the delay was the result of Baker's efforts to recover payment from ASEN for its past-due fees. *Id.* The Funds attempted to obtain the proceeds from the Sale Agreement. See *id.*

On January 5, 2015, Grindon informed Plaintiffs of the Second Letter Agreement (allegedly for the first time) and emailed a copy to Strezo in Illinois. [1-1] at 7-8. Grindon stated in her email to Strezo that the First Letter Agreement had been "revised * * * to comport

with the terms of the credit agreement regarding the event of default for payments to Baker Donelson, which terms were approved by your counsel Anthony Herrera and by ASEN's special committee." [1-1] at 191.

On January 14, 2015, Baker's General Counsel, John Hicks ("Hicks"), sent Pentwater's outside attorney, Steven Aldous, a letter stating that ASEN had made a disposition of assets of at least $20 million and therefore Baker was entitled to be paid by ASEN prior to any "net proceeds" of the sale being paid to Pentwater. [1-1] at 194. Hicks wrote that Pentwater's actions constituted an effort to interfere with Baker and ASEN's attorney-client relationship, that Pentwater had engaged in tortious interference and faced treble and punitive damages, and that ASEN would "seek redress from the courts" if Pentwater did not "retract its demands immediately." *Id.*

On January 28, 2015, Halbower called and spoke with Hicks. [30-1] at 5. Hicks confirmed that Baker had never sent a copy of the Second Letter Agreement to Pentwater, the Funds, or their counsel until January 5, 2015. *Id.*

Plaintiffs filed suit against Baker in Cook County Circuit Court for declaratory judgment (Count I), fraudulent inducement (Count II), fraudulent misrepresentation (Count III), and fraudulent concealment (Count IV). See [1-1]. Plaintiffs' theory is that: (1) Baker provided the First Letter Agreement to Pentwater with the knowledge that Pentwater required it prior to authorizing the Funds to close on the Credit Agreement; (2) Baker then entered into a Second Letter Agreement with ASEN, which altered key terms of the First Letter Agreement, but intentionally concealed the Second Letter Agreement from Plaintiffs and their counsel during the closing of the Credit Agreement; (3) Plaintiffs relied on the First Letter Agreement and extended credit to ASEN under the Credit Agreement, which Plaintiffs would not have done but for the

7

First Letter Agreement; and (4) Plaintiffs were injured in an amount equal to the difference between the $46 million the Funds lent to ASEN and the amount the Funds eventually recover from ASEN.

Baker removed Plaintiffs' action to federal court based on diversity jurisdiction. See [1]. Baker then moved to dismiss the case for lack of personal jurisdiction, failure to join and indispensable party, and failure to state a claim upon which relief may be granted. See [14], [15]. The Court ordered the parties to submit briefs on the personal jurisdiction and indispensable party issues first. See [27]. While the parties were briefing Baker's motion, Plaintiffs voluntarily dismissed their claim for declaratory judgment (Count I) without prejudice. See [35]. In addition, since Plaintiffs filed their motion, ASEN has filed for bankruptcy in the U.S. Bankruptcy Court for the Western District of Texas (Case Nos. 15-bk-70104 & 15-bk-70105). [30] at 16.

## II. Personal Jurisdiction

### A. Legal Standard

A complaint need not allege personal jurisdiction, but once a defendant moves to dismiss on that ground, the plaintiff bears the burden of establishing that jurisdiction is proper. *Purdue Res. Found v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). Where, as here, the defendant moves to dismiss a complaint for lack of personal jurisdiction "based on the submission of written materials, without the benefit of an evidentiary hearing, the plaintiff need only make out a prima facie case of personal jurisdiction." *GCIU-Employer Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009).

In this case, Plaintiffs assert claims arising under Illinois common law. There is no federal statute authorizing nationwide service of process in such cases; therefore this Court

sitting in Illinois may exercise jurisdiction over Baker only if authorized both by the United States Constitution and Illinois law. *be2 LLC v. Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011) (citing Fed. R. Civ. P. 4(k)(1)(A); *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010)). Illinois' long-arm statute "permits its courts to exercise personal jurisdiction on any basis permitted by the constitutions of both Illinois and the United States." *Id.*; see 735 ILCS 5/2-209(c). Thus, in this case, "the state statutory and federal constitutional inquiries merge." *Tamburo*, 601 F.3d at 700.

The federal test for personal jurisdiction under the Due Process Clause of the Fourteenth Amendment authorizes a court to exercise jurisdiction over a non-resident defendant only if the defendant has "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). In other words, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). The requirement that a defendant have "minimum contacts" with the forum ensures that a non-resident defendant will not be forced to litigate in a jurisdiction as a result of "random, fortuitous, or attenuated contacts" with the forum or the unilateral activity of the plaintiff; the defendant "should reasonably anticipate being haled into court" there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985).

"Personal jurisdiction can be either general or specific, depending on the extent of the defendant's contacts with the forum state." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010). Here, Plaintiffs do not assert that the Court has general personal jurisdiction

over Baker; therefore, the Court's inquiry will focus on specific personal jurisdiction only. To establish specific personal jurisdiction, a plaintiff must show that its claims against the defendant "arise out of the defendant's constitutionally sufficient contacts with the state." *uBid*, 623 F.3d at 425. Whether specific personal jurisdiction over a defendant exists depends on "the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). Specific personal jurisdiction exists only if "the defendant's suit-related conduct * * * create[s] a substantial connection with the forum State." *Id.* The "three essential requirements" for establishing specific personal jurisdiction are: "(1) the defendant must have purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state; (2) the alleged injury must have arisen from the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice." *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012) (citations omitted).

B.  **Analysis**

Plaintiffs allege three counts of fraud—an intentional tort—in their complaint against Baker. In cases involving intentional torts, the Court's inquiry into the first "essential requirement[]" for personal jurisdiction, *Felland*, 682 F.3d at 673, "focuses on whether the conduct underlying the claim[ ] was purposely directed at the forum state." *Tamburo,* 601 F.3d at 702 (citation omitted). See also *Walden*, 134 S. Ct. at 1123 ("A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum.").[2] The Seventh Circuit has

---

[2] In their briefs, the parties also analyze the personal jurisdiction issue as if Plaintiffs' claims were for breach of contract. The Court finds it unnecessary to consider those arguments, because Plaintiffs' claims are for fraud, not breach of contract, and different jurisdictional analyses are applicable to the two types of actions. In *Tamburo*, the Seventh Circuit explained that "[p]ersonal jurisdiction in breach-of-contract

characterized this inquiry as an "express aiming" test and explained that it requires "(1) intentional conduct (or 'intentional and allegedly tortious' conduct; (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, plaintiff would be injured—in the forum state." *Tamburo*, 601 F.3d at 703-04 (citing *Calder v. Jones*, 465 U.S. 783, 789-90 (1984)). "If the plaintiff makes these three showings, he has established that the defendant 'purposefully directed' his activity at the forum state." *Felland*, 682 F.3d at 675. He must then establish, as well, that "his injury 'arises out of' or 'relates to' the conduct that comprises the defendant's contacts," *id.* at 676, and that exercising jurisdiction would not "offend traditional notions of fair play and substantial justice," *id.* at 677.

### 1. Intentional and Allegedly Tortious Conduct

Baker does not challenge Plaintiffs' showing as to the first element of the "express aiming" test, although it denies as a factual matter that it committed any tortious acts. Plaintiffs allege that Baker engaged in the following intentional tortious conduct: (1) making "a false statement of material fact to Pentwater and the Funds during the closing of the Credit Agreement" that the First Letter Agreement was in place; and (2) concealing "a material fact from Pentwater and the Funds, namely that a Second Letter Agreement had been executed between Baker and ASEN." [30] at 11.

### 2. Directed at Illinois

Baker argues that Plaintiffs cannot satisfy the second element of the "express aiming" test because "the conduct about which Plaintiffs complain, the creation of the Second Letter [Agreement], was directed to Texas" (where ASEN was located) and not to Illinois (where

---

actions often turns on whether the defendant 'purposefully availed' himself of the privilege of conducting business or engaging in a transaction in the forum state," but "where, as here, the plaintiff's claims are for intentional torts, the inquiry focuses on whether the conduct underlying the claims was purposely directed at the forum state." 601 F.3d at 702.

Pentwater, Halbower, and Strezo are located). [15] at 19. Baker characterizes the complaint too narrowly, however. Baker's creation and execution of the Second Letter Agreement is not the only relevant conduct alleged in Plaintiffs' complaint. According to Plaintiffs' theory of the case, Pentwater's representatives (including CEO/CIO Halbower and portfolio manager Strezo, who are based in Evanston, Illinois) told Baker during the negotiation of the Credit Agreement that Pentwater conditioned its approval of the Funds' loan to ASEN on Baker "refrain[ing] from paying Baker for past due legal fees or any future legal fees (other than $315,000 that ASEN was allowed to pay Baker at the time of the closing of the loan) until such time as ASEN had liquidated assets and through such liquidation received at least $20 million in proceeds and that at least $20 million was utilized to repay debt owed to the Funds." [30-2] at 3 (Strezo declaration).

Grindon acknowledges that she was "advised that Mr. Halbower had told ASEN that the Funds would not close the 2014 Credit Agreement unless ASEN deferred payment of its outstanding legal invoices to Baker." [15-1] at 5. Baker participated in conference calls, emails, and letter correspondence with Pentwater executives and representatives in Illinois during negotiation of the Credit Agreement and the First Letter Agreement. See [30-1] at 3-5 (Halbower declaration); [30-2] at 2-3 (Strezo declaration). See also [15-1] at 5 (Grindon declaration). Strezo sent, received, or was copied on nearly three hundred emails with Baker attorneys relating to the Credit Agreement, First Letter Agreement, and aspects of ASEN's financial situation as they related to Pentwater. On January 31, 2014, Grindon emailed a copy of the executed First Letter Agreement to Strezo in Illinois. [1-1] at 19. The First Letter Agreement directly concerned and stood to benefit Baker, which would receive $315,000 from its financially distressed client ASEN for past-due legal fees when the Credit Agreement closed.

12

According to Plaintiffs' theory of the case, Baker engaged in a fraudulent omission by failing to tell Pentwater about the Second Letter Agreement, which cut out the key language concerning Pentwater, and a fraudulent misrepresentation by representing that the First Letter Agreement was still in place at the time of closing on the Credit Agreement.

Baker's contacts with Pentwater, Halbower, and Strezo in Illinois were not "random, fortuitous, or attenuated"; instead, according to Plaintiffs' allegations, those contacts were intended to induce Pentwater to approve the Funds' investment in ASEN without condition, which resulted in the immediate payment of $315,000 to Baker. *Walden*, 134 S. Ct. at 1123 (quoting *Burger King*, 471 U.S. at 475). The fact that Baker attorneys never travelled to Illinois as part of the transaction is not dispositive given the extensive phone and email communications between Baker and Pentwater representatives in Illinois. The Supreme Court has long recognized that "[a]lthough territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Burger King*, 471 U.S. at 476. Therefore, the Court finds that Plaintiffs have made a prima facie showing that Baker's allegedly tortious conduct was directed toward Illinois. Cf., e.g., *Felland*, 682 F.3d at 676 & n.3 (emails properly were considered as contributing to out-of-state defendant's due process minimum contacts with forum state, in purchasers' action alleging intentional misrepresentation with regard to contract to purchase condominium unit; even though email accounts generally can be accessed in any state, emails went through computer server of internet service provider that had been based in forum state and defendant purposefully sent these emails to residents in forum

13

state knowing that they most likely would be read and have their effect in forum state); *Linkepic Inc v. Vyasil, LLC*, 2015 WL 7251936 (N.D. Ill. Nov. 17, 2015) (internet and technology companies and their owner showed by preponderance of evidence at evidentiary hearing that alleged partner of software developer's registered agent committed intentional and allegedly tortious conduct aimed at Illinois, where it was more likely than not that alleged partner prepared invoices sent to owner in Illinois while knowing that invoiced work had not been completed); *Levin v. Posen Found.*, 62 F. Supp. 3d 733 (N.D. Ill. 2014) (scholar sufficiently alleged, in fraud action against editor, that editor's email, phone, and fax communications to the scholar in Illinois, which "contained the allegedly fraudulent and misleading information on which [the scholar] based his claim," were "sufficient to constitute activities purposes directed at Illinois").

### 3. With Knowledge the Injury Would Be Felt In Illinois

Next, Baker argues that Plaintiffs cannot satisfy the third element of the "express aiming" test because "even if there was an injury resulting from the Second Letter [Agreement], that injury would have been felt in the Cayman Islands," where the Funds are located. [15] at 19. The Court agrees and concludes that Plaintiffs have failed to make a prima facie showing that Baker knew the effects of its allegedly tortious conduct would be felt in Illinois.

Plaintiffs allege that Baker's fraudulent misrepresentations and omissions caused Pentwater and the Funds to suffer damages in an amount equal to "the difference between the $46,350,000 that the Funds lent to ASEN and the amount that the Funds eventually recover from ASEN" under the Credit Agreement. [1-1] at 11, ¶ 49; 12-13, ¶ 54; & 14. As Pentwater concedes, however, only the Funds are parties to the Credit Agreement. The Funds are organized and operate their principal place of business in the Cayman Islands, not Illinois. There is no evidence that the Funds have suffered or will suffer any injury in Illinois as a result of

Baker's alleged fraudulent actions. The only injury to *Pentwater* that Plaintiffs have identified is the loss of $2 million in profits that Pentwater expected to receive in incentive fees from the Funds. See [30] at 13; [30-1] at 2-3. However, under Plaintiffs' theory of the case, if Pentwater had not approved the Credit Agreement, then the Funds would not have made the loan, and Pentwater would not have earned any incentive fee at all. More importantly, assuming that Pentwater's $2 million in lost profits constitutes an injury arising from Baker's alleged fraud, there is no evidence that Baker knew anything about Pentwater's incentive fees or otherwise knew that, if ASEN defaulted on the loan, Pentwater would suffer an injury in Illinois. Cf. *Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 711 (N.D. Ill. 2014) (court did not have personal jurisdiction over employer's claim against former employee for tortious interference with prospective customer (an intentional tort) where there was no evidence that (1) the former employee knew that the employer was injured in Illinois or (2) that the employer actually was injured in Illinois; rejecting as "beside the point" plaintiff's argument that Illinois was the "central point of contact" between the employer, former employee, and prospective customer, because it did "not establish that any injury occurred in Illinois").

In short, Plaintiffs have failed to establish that Baker knew that the effects of its allegedly tortious conduct would be felt in Illinois. Plaintiffs therefore cannot satisfy the Seventh Circuit's "express aiming" test and the Court cannot exercise personal jurisdiction over Baker. *Tamburo*, 601 F.3d at 697. Given this conclusion, the Court finds it unnecessary to consider separately whether Plaintiffs' alleged injury arose from Baker's forum-related activities or whether the exercise of jurisdiction would comport with traditional notions of fair play and substantial justice, see *Felland*, 682 F.3d at 673, or to address Baker's arguments concerning the fiduciary shield doctrine or failure to join indispensable parties.

### III.     Conclusion

For the reasons stated above, the Court grants Baker's motion [14] to dismiss for lack of personal jurisdiction.


Dated: February 5, 2006                                        _____
                                                               Robert M. Dow, Jr.
                                                               United States District Judge